UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

AMBER A. DULGAR,

        Plaintiff,

  v.                              Case No.:  15-CV-706

BLACKHAWK TECHNICAL COLLEGE,

        Defendant.

---

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

---

### PROCEDURAL HISTORY

On October 14, 2016, the parties filed cross-motions for summary judgment on the Plaintiff's claims of FMLA interference and FMLA retaliation. The facts[1] of this case are set forth in the Plaintiff's Proposed Findings of Fact[2] (Dkt. # 43), the supporting evidence filed with the Court, and in Plaintiff's Responses to Defendant's Proposed Findings of Fact, filed herewith.

### SUMMARY

Summary Judgment may not be granted to Blackhawk Technical College ("BTC") because its decision-making employees miscalculated Dulgar's FMLA leave entitlement and discharged her as a result of her need for medical leave and inability to return to work while she still had remaining FMLA leave available. BTC's administration also denied Dulgar's request for extended medical leave, at least in part, because she had taken FMLA leave; did

---

[1] The *Brief in Support of Plaintiff's Motion for Summary Judgment* and *Plaintiff's Proposed Findings of Fact* filed in support of Plaintiff's cross-motion for summary judgment, are adopted and incorporated herein as if set forth with full particularity.

[2] The parties filed the deposition transcripts, evidence, and exhibits cited in this Brief with the initial summary judgment filings on October 14 and 17, 2016.

not afford Dulgar the benefits of the absence policy in its employee handbook because of her use of FMLA leave; and later refused to reinstate her employment because of BTC's believe that she had exhausted her FMLA leave entitlement. Because there is direct evidence of FMLA interference and FMLA retaliation, Summary Judgment for the Plaintiff, not the Defendant, must follow.

## RESPONSE ARGUMENT

### I.   BTC interfered with Dulgar's substantive FMLA rights.

BTC miscalculated Dulgar's FMLA leave entitlement and interfered with her substantive FMLA rights when it terminated her before she expended her FMLA leave entitlement. To defend against this straightforward claim, BTC presents arguments regarding a "holiday rule" and a "business cessation rule" for calculation of FMLA entitlement. The holiday rule is superfluous to the analysis in this case. The "business cessation" rule, outlined in 29 C.F.R. § 825.200(h), applies. When properly applied, 29 C.F.R. § 825.200(h) says that BTC miscalculated Dulgar's FMLA leave. BTC therefore terminated Dulgar while she was eligible for, and BTC was aware of her need for, additional FMLA leave.

### A.   Dulgar's leave was intermittent.

Intermittent leave is FMLA leave taken in separate blocks of time but for the same reason. 29 C.F.R. § 825.203(a). "There is no limit on the size of an increment of leave when an employee takes intermittent leave." 29 C.F.R. § 825.203(d). Ms. Dulgar took two blocks of FMLA leave for her serious ongoing urologic and gynecologic health conditions. Dulgar's leave was intermittent even though BTC classified it at the time as continuous. (*See* Dkt. # 48 - Moore Dep. Exs. 2, 15.) Dulgar's first FMLA leave began on Tuesday, October 28, 2014, and ran through January 13, 2015. (PPFOF 13, 24, 26, 29, 49.) Her second FMLA leave began on March

26 and ran through April 6, 2015 (PPFOF 58, 63, 71-75, 81.) It should have continued to run through April 9, 2015. (PPFOF 97.)

> ### B. BTC's "holiday rule" does not apply because the leave was taken in two blocks rather than increments less than one week.

BTC inexplicably breaks the FMLA entitlement calculation into two separate "methods" in its summary judgment brief, perhaps anticipating an FMLA estoppel argument based on its FMLA administrator's misrepresentations to Dulgar in connection with the designation notice provided to her for her first block of FMLA leave. Whatever the reason, in support of the "holiday rule" calculation, BTC cites "DOL Fact Sheet #28J" and a First Circuit case of first impression, which described the idea as follows, "the fact that a holiday may occur within the week taken as FMLA leave has no effect; the week is counted as a week of FMLA leave[,]" unless the employee is taking leave in increments of less than one week (hereafter referred to as the 'Holiday Rule')"; (Def. October 14, 2016 Br. p. 24) (citing *Mellen v. Trs. of Boston Univ.*, 504 F.3d 21, 24-26 (1st Cir. 2007). The DOL Fact Sheet is not law, the First Circuit case is not controlling law, and the "holiday rule" is not at issue.

Even if it was controlling law, *Mellen* involved an employee advocating for three separate one-day holidays (Labor Day, Veterans Day, and a one-day employer holiday) to not count against her FMLA entitlement, even though she was not taking FMLA in less than one-week stints, and instead took two large blocks of leave *à la* Dulgar. 504 F.3d at 25. The First Circuit found that if an employee's intermittent leave includes a full, holiday-containing week, 29 C.F.R. § 825.200(f)[3] provides that the 'amount of leave used' includes the holiday, which is unaltered by 29 C.F.R. § 825.205(a). *Id.* The 'amount of leave actually taken' to which section 825.205(a) refers is the 'amount of leave used' defined in section 825.200(f). *Id.* Because the

---

[3] On January 16, 2009, two years after *Mellen* was decided, 29 C.F.R. § 825.200(f) was renamed 825.200(h).

employee in *Mellen* was not using day-to-day, or less than week-long, intermittent FMLA, and the holidays in question in *Mellen* that were eclipsed by the two leave blocks were only one-day holidays, the Court correctly applied the Code of Federal Regulations to the facts in that case.

Although Dulgar's first FMLA leave eclipsed a two-day Thanksgiving holiday that BTC originally indicated would not count against her FMLA entitlement, which served to confuse Dulgar, the parties do not dispute that BTC later communicated to Dulgar that it had changed its mind and would count it. (PPFOF 29-30, 32, 50, 51, 59; DPFOF 119-120.) BTC's "holiday rule" argument is a distraction from the real issue in this case, and should be disregarded or otherwise acknowledged by the Court as inapplicable.

### C. The "business cessation" rule (29 C.F.R. § 825.200(h)) says that BTC miscalculated Dulgar's FMLA entitlement.

The real issue in this case is the nine-calendar-day, seven-work-day winter break closure that BTC counted against Dulgar's FMLA leave entitlement. (Gohlke Dep. Ex. 8; PPFOF 37). 29 C.F.R. § 825.200(h) reads, "[I]f for some reason the employer's business activity has temporarily ceased and employees generally are not expected to report for work for **one or more weeks** (*e.g.,* a school closing two weeks for the Christmas/New Year holiday or the summer vacation or an employer closing the plant for retooling or repairs), the days the employer's activities have ceased do not count against the employee's FMLA leave entitlement." (Emphasis added). In its Brief, BTC calls this the "Business Cessation Rule". Citing absolutely no authority, BTC concludes that, "the Business Cessation Rule did not apply to the College's winter holiday because the holiday did not result in a cessation of operations of 'one or more weeks.'" To get there, BTC uses tortured logic that ignores the plain language of 29 C.F.R. § 825.200(h). BTC argues that because employees had to work on Monday and Tuesday of the first week of the winter break (December 22-23, 2014) and report to work the following Friday (January 2, 2015),

9 days later, that it was not a closure for one or more weeks. (*See* Pl.'s Resp. Def.'s Prop. Find. Fact 127).  BTC would apparently have this Court read the term "full calendar workweek" into the place of the readily discernible term "week" in the Code.

In addition to the obviousness of the plain language of the relevant Code provision, the idea of counting only full Monday through Friday calendar weeks in this FMLA entitlement calculation or in any FMLA entitlement calculation does not make sense. Employees' FMLA leaves do not necessarily begin on Mondays and run through Fridays. The Defendant admits, as it must, that partial weeks of FMLA leave entitlement and calculation are available to employees. (*See* DPFOF 128; Def.'s Summ. Jud. Br. 25-26). In this case, Dulgar's FMLA leaves began on a Tuesday (first FMLA leave) and a Thursday (second FMLA leave). Just like BTC could not charge Dulgar full weeks of FMLA time for October 28-31, 2014 (4 days) or January 12-13, 2015 (2 days), it cannot discount holidays running more than a week but not a Monday through Friday workweek for purposes of determining a 29 C.F.R. § 825.200(h) business cessation. Again, BTC would define a 29 C.F.R. 825.200(h) "week" instead as something like "a full calendar workweek beginning on Monday and ending on Friday."

Notably, 29 C.F.R. § 825.200(h) does not say "workweek," a term used prevalently in the FMLA itself. *See* 29 U.S.C. § 2611. It must therefore be presumed that the Department intended something other than "employer's typical and full calendar workweek" or even "workweek" when it codified the term "week" in 29 C.F.R. § 825.200(h). By any reasonable definition, BTC ceased operations for more than a week, so those seven workdays must not be counted against Dulgar's FMLA leave entitlement. BTC's miscalculation and termination of Dulgar in light of that calculation, after she had used only eleven weeks and two days of leave[4], is FMLA

---

[4] A calculation supported by the DOL Investigator in this case (DPFOF 158, 159) and conceded by BTC's own FMLA Administrator, Moore, in litigation (PPFOF 93-95; Moore Dep. 101, Gohlke Ex. 8 – green calendar).

interference. Gohlke and Moore admitted that if BTC discharged Dulgar during her FMLA entitlement, that it was FMLA interference. (PPFOF 99.) It did, so it was interference.

## II.    BTC's miscalculation of Dulgar FMLA leave harmed her.

BTC argues that even if it miscalculated Dulgar's FMLA leave entitlement, that she was not harmed, and therefore cannot recover. Dulgar disagrees. BTC's miscalculation clearly caused Dulgar's termination. (PPFOF 81, 82, 87.) BTC's miscalculation also caused BTC to believe that Dulgar had exhausted her FMLA, which, aside from the illegality of that same conduct under the FMLA anti-retaliation protections, was also the reason that Gohlke refused to reinstate Dulgar after her discharge. (PPFOF 92; Gohlke Dep. 87.)

### A. Dulgar did not get *bona fide* FMLA leave she was entitled to receive.

#### 1.    BTC's cited cases are distinguishable because those employees received a full twelve weeks of leave and Dulgar did not.

BTC cites *Ragsdale v. Wolverine Worldwide*, 535 U.S. 81 (2002), and out-of-circuit cases citing it, to support the proposition that if an employee receives twelve weeks of time off, regardless of whether it is called or designated as FMLA, they cannot then establish that they were substantively harmed with respect to their FMLA rights. Those cases, however, involved situations where employees apparently received a full twelve weeks of medical leave. In this case, BTC fired Dulgar before she exhausted her twelve weeks of FMLA leave. She still had three days left, and would not have been considered absent without excuse until April 13, 2015, if she had not reported on that day because of BTC's closure on Friday, April 10, 2015. (PPFOF 86.) Per BTC's written policy, Dulgar then would not have been considered to have "resigned" for missing work after April 13, 2015, until failing to report for work for three consecutive workdays. (PPFOF 83-84.) She had a doctor's note on file at the time clearing her to return on April 15, 2015. (PPFOF 72-73.) BTC's decision to terminate Dulgar on April 8, 2015 for

missing April 7, 2015 therefore interfered with her substantive FMLA rights. BTC admits that if she was terminated prematurely, which she was, that it was interference. (PPFOF 99.) It was also unlawful retaliation, as discussed further, *infra*.

> **2. BTC approved a four-day extended medical leave beyond Dulgar's FMLA leave, which would have allowed her to return on April 15 if appended to her FMLA entitlement.**

BTC determined that four days of extended of leave was reasonable for Dulgar. (PPFOF 101.) If Dulgar's FMLA leave had properly been calculated to run its course, Dulgar could have appended those four days of approved extended leave to the end of her FMLA entitlement, giving her coverage *through* April 15, 2015, her doctor's release date. (PPFOF 60-66, 72-73.) The FMLA does not require BTC to provide extended medical leave. In this case, because BTC believed it had approved and provided Dulgar with four days of extended leave, its decision not to provide Dulgar with the same leave on even the partial basis that Dulgar had exercised and exhausted her FMLA leave (PPFOF 77-78; Dkt. # 33 - Gohlke Decl. ¶ 36), is prejudicial to her and is direct evidence of FMLA retaliation for having utilized her statutory rights. "[E]mployers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions...." *Pagel v. TIN Inc.,* 695 F.3d 622 (7th Cir. 2012) (citing 29 C.F.R. § 825.220(c)). BTC understood that by not granting Dulgar's "extended leave", it was effectively firing her. (PPFOF 80.)

> **3. Dulgar could and would have returned to work as early as April 13, and endured her pain, if necessary.**

Dulgar admits that Dr. Kaveggia's note on file with BTC as of April 6, 2015 did not release her to return to work until April 15, 2015, but BTC stretches the truth by arguing that "[p]laintiff admits that she was unable to work as of April 14, 2015." Dulgar admitted that the doctor's note submitted before her unlawful termination listed April 15, 2015 as the projected

return to work date after her scheduled, pending surgery, and that was the only document on file with BTC at the time. However, Dulgar testified that she could and would have returned on April 13, 2015 and worked through her pain to save her job. (PPFOF 100; Dkt. # 21, Dulgar Dep. 147-148; Dkt. # 37- Dulgar Aff. ¶ 8.)

BTC cites *Stoops v. One Call Commc'ns, Inc.*, 141 F.3d 309 (7th Cir. 1998), to support its argument that the opinions and facts that matter were those in the possession of BTC at the time of the relevant decision-making. However, *Stoops* is distinguishable from Dulgar's case in that the employee in *Stoops* apparently provided medical documents that failed to establish FMLA-qualifying reasons for his absences. In Dulgar's case, Moore testified that the April 6, 2015 email and attached letter from Dr. Kaveggia were sufficient notice and information to extend the FMLA leave if Dulgar had FMLA time left. (PPFOF 73; Dkt. # 26, Moore Dep. 109.) *Stoops*, therefore, does not help BTC.

Dulgar clearly could and would have returned to work on Monday, April 13, 2015 and endured her pain if she had known that doing so would save her job. (PPFOF 100; Dkt. # 21, Dulgar Dep. 147-148; Dkt. # 37- Dulgar Aff. ¶ 8). BTC argues that because Dulgar knew or should have known based on its April 2, 2015 letter that BTC would consider terminating her for not appearing on April 7, 2015, along with the fact that she did not appear on that date, somehow evinces that she also then would not have appeared on April 13, 2015. The two weeks are distinguishable, and BTC's argument is a deductive fallacy.

Dulgar concedes that she could not return on April 7, 2015 because she did not have a return to work slip from her doctors, and (although not in the Record) doubts that she could have gotten one, as she awaited a surgical procedure scheduled for Thursday, April 9, 2015. (PPFOF 72, 74.) Dulgar also asserts that at the time she submitted the (improperly required because

Dulgar had FMLA time remaining) request for extended medical leave, that she expected it would be granted. (Dkt. # 37 - Dulgar Aff. ¶ 9.) On April 9, 2015, Dulgar had the procedure. (PPFOF 85.) Dulgar therefore concedes that she could not work during that week. (PPFOF 72, 74, 85.) Comparing the week of surgery to the following week, after the surgery, is comparing apples to oranges.

Dr. Kaveggia supports his patient's decisions regarding their return to work, tells all of his patients as much, and would have supported Dulgar had she needed to return on April 13, 2015. (PPFOF 100; Kaveggia Expert Report, Dkt. # 18; Dkt. # 22 – Kaveggia Dep. 32-33.) Of course, as of April 13, 2015, all of this was mooted by BTC's illegal termination of Dulgar on April 8, 2015. Dulgar, then unrepresented by counsel, had no reason to believe that a doctor's note releasing her to return two days earlier than planned, after she received a termination letter, would be of any significance to her. BTC attacks Dulgar for her "revisionist" position[5], but the fact is that she should never have been put in a position to have to make the argument. It was not until the DOL Wage and Hour Investigator asked Dulgar if her physician would have supported her return to work on April 13, 2015, that at the DOL's request, she secured an August 4, 2015 note affirming that Dr. Kaveggia would have supported her decision to return early. (DPFOF 166-170.) Dr. Kaveggia's expert report and deposition further clarified that every patient is different, the patient is given leeway based on their pain levels, that he supports his patients' decisions to return to work, and finally, that it's possible for patients to return to work as early as three days after the procedure Dulgar underwent on April 9, 2015. (Dkt. # 18 – Dr. Kaveggia Expert Report; Dkt. # 22 – Kaveggia Dep. 32-34, 42-43.) Dulgar could have and would have returned on April 13, 2015 and endured her recovery pain in order to protect her job if she had been afforded the opportunity. (PPFOF 100).

---

[5] BTC tried on its own "revisionist" hat at DPFOF 106.

III.     **Dulgar has direct evidence of BTC's FMLA retaliation.**

The Defendant's Motion for Summary Judgment must also be denied because Dulgar has direct evidence of FMLA retaliation.

A.     **Dulgar's termination was FMLA retaliation.**

As discussed in the October 14, 2016 *Brief in Support of Plaintiff's Motion for Summary Judgment*, the sole reason for Dulgar's termination was her need for additional medical leave, the perceived exhaustion of her FMLA entitlement, and her absence from work on April 7, 2015 due to her need for medical leave. (PPFOF 87). Gohlke recommended not granting the second request for extended FMLA leave because he believed it to be beyond Dulgar's FMLA entitlement. (PPFOF 78). Eckert denied Dulgar's request for extended leave, among other reasons, because he was told that other people were taking on Dulgar's workload, that work was piling up, and that "it seemed to be continuing," meaning a pattern that Dulgar was requesting more medical leave. (PPFOF 77-78.) Eckert knew that by denying the extended leave, that Dulgar would be terminated. (PPFOF 80.) Dulgar's termination was retaliation for exercising her FMLA rights because BTC improperly considered the FMLA leave as a negative factor in the adverse employment actions. *Pagel,* 695 F.3d 622.

B.     **BTC's refusal to extend Dulgar's leave was FMLA retaliation.**

Eckert determined the Dulgar's request to extend her leave four working days beyond what he believed to be the exhaustion of her FMLA entitlement was reasonable, and he approved that request. (PPFOF 101.) If that four-day leave of absence had been applied after the exhaustion of Dulgar's actual legal FMLA entitlement when properly calculated, then she could have and would have been able to return to work at BTC on April 15, 2015, as scheduled. She would have only needed two workdays of extended coverage pursuant to the doctor's note on

file. (PPFOF 72-73). Eckert relied instead on Gohlke's assessment that Dulgar's leave requests were excessive and work was piling up, and honored Gohlke's recommendation to terminate Dulgar based on the same. (PPFOF 77-78.) Because Dulgar's only leave requests were protected by the FMLA, the decision to deny the extended leave request based in part on the "pattern" of leave requests is FMLA retaliation. *Pagel,* 695 F.3d 622.

### C.   The denial of forbearance under the handbook was FMLA retaliation.

Next, instead of permitting Dulgar the forbearance it allows employees under its Employee Handbook absence policy, BTC terminated Dulgar the first day she was absent from work without explicit approval, even though it knew she would not be at work due to her medical condition and upcoming surgery. (PPFOF 83-84, 87.) Had BTC afforded Dulgar the protection outlined in the Employee Handbook, she would not have been terminated on April 8, 2015 for missing April 7, 2015, and she would not have been terminated at all. (PPFOF 83-84.) Dulgar would have been considered to have voluntarily resigned under the Employee Handbook policy only if she had (a) failed to provide advanced notice and then (b) did not appear for three scheduled workdays. (PPFOF 83-84.)

Dulgar did not receive the benefits of that handbook policy given that she provided advanced notice more than 30 minutes ahead of her next scheduled shift and also submitted evidence from a doctor of her need for leave. Because BTC perceived Dulgar to have exhausted her FMLA entitlement and to have been engaged in a pattern of requesting medical leave extensions, she was immediately terminated after not appearing for work for one day while she recovered from one surgery and awaited another, in abrogation of the written handbook policy. (PPFOF 77-78, 87.) BTC's termination of Dulgar despite the protections of BTC's extended leave policy and the employee absence policy, and due to its perception that she repeatedly

requested leave extensions, which were all covered by the FMLA, along with its misperception that she exhausted her FMLA leave, is direct evidence that mandates a finding of summary judgment for Dulgar on the issue of FMLA retaliation and forecloses BTC's argument that it is entitled to summary judgment. *Pagel,* 695 F.3d 622.

### D. BTC's refusal to reinstate Dulgar was FMLA retaliation.

Gohlke and BTC refused to reinstate Dulgar's employment because she exercised and exhausted her FMLA rights. (PPFOF 92.) BTC knew as early as April 6, 2015, and therefore at the time of her discharge, that Dulgar could have returned to work on April 15, 2015. (PPFOF 72-73.) Dulgar remains eligible for rehire at BTC. (PPFOF 88.) The DOL Investigator, after finding FMLA violations, recommended that BTC reinstate Dulgar. (PPFOF 91.) Instead of returning Dulgar to its workforce on April 15, 2015, or later at the DOL investigator's recommendation, BTC replaced Dulgar with Jessica Primus on June 1, 2015 after it posted her position internally for BTC employees and interviewed her for the position. (PPFOF 89.) Gohlke outright admitted that BTC retaliated against Dulgar for using her FMLA entitlement when he testified that BTC did not reinstate Dulgar because she exhausted her FMLA leave. (PPFOF 92; Gohlke Dep. 87); *Pagel,* 695 F.3d 622.

Gohlke's unequivocal deposition testimony that the only reason Dulgar was not reinstated was because she "exhausted her Family Medical Leave" is direct evidence of FMLA retaliation[6]. (PPFOF 92; Gohlke Dep. 87.) Any new, not-yet-presented, self-serving evidence presented to rebut this evidence by suggesting that Dulgar's performance played a role in the decision not to reinstate Dulgar stands inapposite to the adverse examination of Gohlke

---

[6] Dulgar offers direct evidence of retaliation and interference for purposes of her summary judgment motion and for purposes of opposing the Defendant's Motion For Summary Judgment. If Dulgar does not receive summary judgment finding BTC liable for FMLA interference and retaliation, she specifically reserves and does not waive her right to present and argue all indirect evidence, in addition to direct evidence, in subsequent proceedings, in order to bolster her FMLA claims.

conducted on September 29, 2016, and cannot serve as a material dispute to forestall summary judgment in this case. "A 'sham affidavit' is an affidavit that is inadmissible because it contradicts the affiant's previous testimony … unless the earlier testimony was ambiguous, confusing, or the result of a memory lapse." *Cook v. O'Neill*, 803 F.3d 296, 298 (7th Cir. 2015) (citing *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 759 (7th Cir. 2006); *Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1168-71 (7th Cir. 1996)). Gohlke admitted that he retaliated against Dulgar for exercising her FMLA rights, and BTC cannot fix that testimomy. Dulgar is entitled to summary judgment, and BTC is not.

### IV. Dulgar's job performance is inconsequential to the analysis in this direct evidence FMLA wrongful discharge and refusal to reinstate case.

The *Defendant's Motion for Summary Judgment* and supporting arguments inefficiently focus on BTC's allegation that Dulgar performed her job poorly. BTC's entire performance diatribe is a red herring argument that should be summarily ignored for three primary reasons.

#### A. BTC has never claimed that Dulgar's performance motivated the termination and refusal to rehire decisions at issue in the case.

First, BTC did not claim at the time of Dulgar's termination, in the termination phone call placed to her, in the termination letter sent to her, in its internal termination paperwork, in response to admissions requests, at depositions, or even in its brief, that Dulgar's termination was due to anything other than its perception that she exhausted her FMLA leave and her failure to report for work on April 7, 2015. (PPFOF 81, 87, 88.) BTC concedes that Dulgar's performance "was not *the* reason for her termination…". (Def.'s Summ. J. Br. p. 3.) Yet BTC poured huge time and effort into detailing Dulgar's alleged performance issues in its PFOF and its brief.

BTC's attempt to interject the performance issue into the equation rests almost solely on Eckert's brief testimony that Dulgar's performance was something he considered (along with the unlawful FMLA-based motives) in deciding not to extend Dulgar's medical leave. (PPFOF 76-78.) Gohlke initially did not testify at his deposition that he relayed to Eckert, in connection with Dulgar's second extended leave request, any information regarding poor job performance other than that " the work was piling up."[7] (PPFOF 77-78; Eckert Dep. 126.) However, BTC submitted new evidence in the form of a Declaration from Gohlke, for the first time suggesting that he told Eckert, in connection with the second extended leave request, about Dulgar's allegedly poor performance in addition to the work piling up. (*Compare* Gohlke Decl. ¶ 36) *with* (Gohlke Dep. 125-126.) It is notable that the work piled up, at least in part, because Dulgar took FMLA leave for twelve weeks between the end of October 2014 and early April 2015. (Dkt. # 25, Ranguette Dep. 25, 48; Dkt. # 22, Dulgar Dep. 263-264.)

So the only evidence that connects the termination to Dulgar's performance is that two of the four factors Eckert says he considered in making the decision to deny the second "extended medical leave" were Dulgar's performance and behavior. (PPFOF 77-78; Eckert Dep. 28.) The other two factors were her requests for FMLA (and exhaustion thereof) and the nature of her requests for FMLA leave. (*Id.*; Eckert Dep. 126; Gohlke Decl. ¶ 36.) The combination of the direct evidence of FMLA retaliation and other factors does not excuse BTC from liability, as discussed in sub. B, *infra*.

---

[7] The FMLA permits employers to deny job restoration protection for "key" salaried FMLA-eligible employees. *See* 29 U.S.C. § 2614(b)(2). A Department of Labor Regulation states "an employer may deny job restoration to salaried eligible employees ('key employees,' as defined in paragraph (c) of § 825.217) if such denial is necessary to prevent substantial and grievous economic injury to the operations of the employer." 29 C.F.R. § 825.216(c). "A 'key employee' is a salaried FMLA-eligible employee who is among the highest paid 10 percent of all the employees employed by the employer within 75 miles of the employee's worksite." 29 C.F.R. § 825.217(a); 29 U.S.C. § 2614(b)(2). BTC has not suggested, nor could it, that Dulgar was considered a "key employee".

Also, as previously argued in the October 14, 2016 *Brief in Support of Plaintiff's Motion for Summary Judgment* and again in this Brief *supra*, because Eckert decided that four days of extended leave was reasonable for Dulgar, and because BTC miscalculated Dulgar's FMLA entitlement, those four days should have been added to the end of her actual FMLA entitlement, giving Dulgar more than enough time to return to work on April 15, 2015.

### B.    FMLA retaliation permits a "mixed motive" analysis for adverse employment actions, and FMLA interference is strict liability.

Second, even assuming *arguendo* that Dulgar's work performance contributed to decisions that resulted in the adverse employment actions, to succeed on a retaliation claim, the plaintiff does not need to prove that retaliation was the only reason for her termination. Dulgar, "may establish an FMLA retaliation claim by 'showing that the protected conduct was a substantial or motivating factor in the employer's decision'." *Goelzer v. Sheboygan Cnty., Wis.*, 604 F. 3d 987, 990 (7th Cir. 2010) ((citing *Lewis v. Sch. Dist. # 70*, 523 F.3d 730, 741 (7th Cir. 2008) (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005)). Dulgar can prevail and recover damages in a "mixed-motive" FMLA retaliation case. This is not a "but for" analysis, as it would arguably be under the ADEA, so BTC's citation of *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981), to support a proposition that BTC only must establish a lawful reason for the discharge, is misplaced. In *Lewis* and its progeny, the 7th Circuit has specifically outlined a distinction between FMLA retaliation and other employment discrimination cases like the ADEA. Because Dulgar has direct evidence of retaliation, i.e., the admissions of Eckert and Gohlke that they considered and held against her the fact that she had previously requested and exhausted her FMLA leave, she must prevail. (PPFOF 77-78.)

To prevail on an FMLA interference claim, Dulgar need only show that her employer deprived her of an FMLA entitlement; no finding of ill intent is required. *Burnett v. LFW Inc.*,

472 F.3d 471, 477 (7th Cir. 2006) (citing *Hoge v. Honda Am. Mfg., Inc*., 384 F.3d 238, 244 (6th

Cir. 2004)). FMLA interference is a strict liability proposition. "We shall continue to resolve

suits under the FMLA in the same direct way we did in *Price v. Ft. Wayne,* 117 F.3d 1022 (7th

Cir. 1997): by asking whether the plaintiff has established, by a preponderance of the evidence,

that he is entitled to the benefit he claims." *Diaz v. Fort Wayne Foundry Corp.,* 131 F.3d 711,

712 (7th Cir. 1997).  BTC's argument that it did not interfere with Dulgar's leave by

miscalculating her leave entitlement is unsupported by case law and stands inapposite to the

plain language of 29 C.F.R. § 825.200(h). BTC fired her before she expended her FMLA leave.

Contrary to BTC's misleading repetition of something it knows is not true, she was only afforded

eleven weeks and two days of FMLA leave before her termination. That is FMLA interference

per the simple FMLA liability rubric outlined in *Diaz*.

### C. BTC's indirect evidence, *McDonnell-Douglas,* "circumstantial evidence", summary judgment argument is a straw-man concoction inapplicable to this direct evidence FMLA case.

BTC focuses its brief, to the tune of half its Argument, on the unnecessary straw-man

proposition that Dulgar does not have an indirect, circumstantial evidence case. BTC would have

the Court bury its head in the sand and ignore the admissions BTC considered and held its

misperception that Dulgar exhausted her FMLA entitlement against her when making

termination decisions. Perhaps it is a guise to bombard the Court with evidence of Dulgar's

allegedly poor performance[8] or BTC's anticipation of a phantom indirect evidence summary

judgment motion by the Plaintiff. In any event, the *McDonnell-Douglas* framework, which BTC

argues would require the Plaintiff to produce evidence of similarly situated employees who were

not in the protected class who were treated more favorably and then produce evidence of pretext

---

[8] Despite laundry listing Dulgar's documented performance issues, BTC was careful in its pleadings, discovery responses, and even in depositions to never characterize Dulgar's performance concerns as disciplinary in nature, almost certainly to avoid the charges that they were materially adverse and/or retaliatory.

to rebut articulated reasons for a discharge, does not apply to this <u>direct evidence</u> FMLA

interference and retaliation case. *Diaz v. Fort Wayne Foundry Corp.,* 131 F.3d 711, 712-713 (7th

Cir. 1997) ("Although several district judges have used a variant of *McDonnell Douglas* for

substantive FMLA cases…we disapprove their conclusions.") (internal citations omitted). Diaz

was a "substantive rights" FMLA case, like Dulgar's, in which the Seventh Circuit flatly stated,

"[w]e shall continue to resolve suits under the FMLA in the same direct way we did in *Price v.*

*Ft. Wayne*, 117 F.3d 1022 (7th Cir.1997): by asking whether the plaintiff has established, by a

preponderance of the evidence, that he is entitled to the benefit he claims." *Id.* BTC's Motion for

Summary Judgment must be denied because BTC's primary defense, based on a rigid

*McDonnell-Douglas* analysis, focusing on an argument that Dulgar did not perform her job to

expectations, cannot produce evidence of comparators, and BTC articulated some legitimate

reasons for its decision not to extend her leave[9], is not only rebutted and disputed by Dulgar[10],

but it does not apply in light of the direct evidence of FMLA retaliation and substantive right

interference that mandates summary judgment for Dulgar.

### D. BTC's invocation of the same-actor inference is misplaced.

For the same reasons, namely, the existence and prevalence of clear direct evidence of

FMLA retaliation and interference, BTC's "same actor inference" argument must fail. The same

actor inference is a rebuttable presumption available to employers in the defense of

circumstantial evidence discrimination cases, which does not apply to direct evidence cases.

---

[9] Defendant ignores that the *McDonnell-Douglas* analysis is supposed to be a flexible framework and not a strict rubric for circumstantially establishing employment discrimination. *Merillat v. Metal Spinners, Inc.,* 470 F.3d 685, 690 (7th Cir. 2006) (citation and internal quotation marks omitted).
[10] Even if Dulgar's performance had an impact on BTC and its decionmaking, whether she performed poorly remains a disputed issue of fact because Dulgar disputes, objects to, and rebuts nearly all of the performance allegations and memorandums leveled against her. (Some examples include DPFOF 18, 26, 29, 37, 45, 55, 73, etc.). Plaintiffs may establish "pretext" by showing that the articulated reason(s) are false and a "cover-up" for discrimination. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502 (1993).

*Johnson v. Zema Systems Corp.*, 170 F.3d 734 (7th Cir. 1999). In *Johnson,* the Seventh Circuit

outlines situations under which the "Same Actor Inference" may be disregarded:

> The psychological assumption underlying the same-actor inference may not hold true on the facts of the particular case. For example, a manager might hire a person of a certain race expecting them not to rise to a position in the company where daily contact with the manager would be necessary. Or an employer might hire an employee of a certain gender expecting that person to act, or dress, or talk in a way the employer deems acceptable for that gender and then fire that employee if she fails to comply with the employer's gender stereotypes. Similarly, if an employee were the first African-American hired, an employer might be unaware of his own stereotypical views of African-Americans at the time of hiring. If the employer subsequently discovers he does not wish to work with African-Americans and fires the newly hired employee for this reason, the employee would still have a claim of racial discrimination despite the same-actor inference.

170 F.3d at 745.

Simply put, BTC's witnesses' admissions that BTC terminated Dulgar in interference

with her FMLA entitlement; did not grant her extended medical leave (for which she had FMLA

entitlement), in part, because it perceived her to have exhausted her FMLA leave; did not afford

Dulgar the benefits of the written absence policy in its employee handbook before firing her; and

did not reinstate her employment after she became available for work or after the Department of

Labor investigator found FMLA violations and suggested reinstatement because it perceived

Dulgar to have exhausted her FMLA entitlement; <u>all</u> rebuts, refutes, and eviscerates the same-

actor inference and BTC's argument that it is entitled to summary judgment on that or any other

basis.

## CONCLUSION

Based upon the undisputed facts of this case and the protections of the FMLA against

interference and retaliation, BTC's motion for summary judgment must be DENIED, and

Plaintiff's motion for summary judgment must be GRANTED.

Dated this <u>4th</u> day of November, 2016.

<u>s/ Nicholas  M. McLeod</u>

- 18 -

Nicholas M. McLeod, SBN: 1057988
Alan C. Olson, SBN:  1008953
Attorneys for Plaintiff
Alan C. Olson & Associates, S.C.
2880 S. Moorland Rd.
New Berlin, WI 53151
Telephone: (262) 785-9606
Fax: (262) 785-1324
Email: NMcLeod@Employee-Advocates.com